[CERTIFIED TRANSLATION]

[illegible]

SJ2020CV05909   11/02/2020   04:54:06 p.m.   Entry No. 1   Page 1 of 2

COMMONWEALTH OF PUERTO RICO
GENERAL COURT OF JUSTICE
COURT OF FIRST INSTANCE
Superior Court, _____ Part

| | |
|---|---|
| VANESSA SACARELLO<br><br>Plaintiff<br><br>v.<br><br>AMERICAN AIRLINES, INC.<br><br>Defendant | CASE NO.: **SJ2020CV *05909***<br><br>Courtroom No.: **804**<br><br>Re: SUMMARY EMPLOYMENT CLAIM PROCEDURE |

**SUMMONS**
**SUMMARY EMPLOYMENT CLAIM PROCEDURE ACT**

THE UNITED STATES OF AMERICA
THE PRESIDENT OF THE UNITED STATES
THE COMMONWEALTH OF PUERTO RICO

[ink stamp:
RECEIVED
**NOV 03 2020**
(illegible initials) (*11:32 a.m.*)
REICHARD & CALAF P.S.C.]

TO:         AMERICAN AIRLINES, INC.
Name of the defendant being summoned

LUIS MUÑOZ MARÍN AIRPORT, CAROLINA, PR
Address of the defendant being summoned

YOU ARE HEREBY served with a copy of the complaint filed against you, pursuant to Act No. 2 of October 17, 1961, as amended, and advised that you must file your answer to same in writing with the Court, through the Unified Case Management and Administration System (SUMAC, by its Spanish acronym), which you can access through the following electronic address: https://unired.ramajudicial.pr, unless you represent yourself, in which case you must file your responsive pleading with the court clerk's office, with proof of service thereof on the plaintiff's attorney, or the plaintiff, if the plaintiff appeared pro se, within ten (10) days of service of this summons, if the service occurred within the Judicial Region where the action was filed, and within fifteen (15) days, in any other case. You are hereby further advised that if you fail to comply with this, judgment will be entered against you, granting the relief sought, without further summoning or hearing you.

MR. ENRIQUE J. MENDOZA SÁNCHEZ, ESQ. / MR. ENRIQUE J. MENDOZA MÉNDEZ
Name of plaintiff's attorney or the party,
if the party does not have legal counsel

21143 / 8304
Supreme Court number, if an attorney

P.O. BOX 9282
SAN JUAN, PUERTO RICO  00908-0282
Address

(787) 722-5522
Telephone number; Fax number

mendozalo@yahoo.com
Email Address

[ink stamp: **NOV 02 2020**]

Issued under my signature and the Seal of the Court, on this _____
[round ink stamp:
COMMONWEALTH OF PUERTO RICO
GENERAL COURT OF JUSTICE
COURT OF FIRST INSTANCE
SUPERIOR COURT, SAN JUAN PART]
K027 (illegible initials)

[ink stamp:
**Griselda Rodríguez Collado**
**Regional Clerk**]
Regional Clerk
**María Ocasio Rodríguez**
Name and Signature of
**Deputy Court Clerk**] (illegible scribble)
Deputy Court Clerk

[CERTIFIED TRANSLATION]

[illegible]   Page 2 of 2
SJ2020CV05909   11/02/2020   04:54:06 p.m.   Entry No. 1   Page 2 of 2

## PROOF OF SERVICE BY PRIVATE INDIVIDUAL

I, [hw: *Carlos Soto Aponte*], do hereby state that I have the legal capacity required under Rule 4.3 of the Rules of Civil Procedure of Puerto Rico, and I certify that I served the summons and the complaint in the case of reference on [hw: *November 13*], 2020, in the following manner:

By personal delivery to the defendant at the following physical address: [hw: *CT Corp., through Atty. Federico Calaf – Representative, CT Corp.*]
_____

Accessible in the immediate presence of the defendant, at the following physical address:
   [hw: *361 San Fco. Street    4th Floor*
        *San Juan, PR   00901-1748*]
_____

Leaving copies of the documents with an agent authorized by the defendant or designated by law to receive summonses, at the following physical address:
_____
_____

The summons could not be served personally because:
_____
_____
_____

## COSTS OF SERVICE
$ _____

## SUMMONS SERVER'S STATEMENT

I hereby state under penalty of perjury, in accordance with the laws of the Commonwealth of Puerto Rico, that the information provided in the proof of service is true and correct.

AND IN WITNESS WHEREOF, I sign the foregoing in [hw: *San Juan*], Puerto Rico, this [hw: *13th*] of [hw: *November*], 2020.

                    [illegible signature]
                    (Summons Server's Signature)

                    Summons Server's Address:
                    _____
                    _____
                    _____

AFFIDAVIT NO.: _____

   Sworn to and signed before me by _____,
whose personal information is as stated above, whom I certify that I know _____
_____.
(personal knowledge, or, if not, identification through the supplemental means laid down in the Notary Act)

   In _____, Puerto Rico, on _____, 2020.

                    _____
                    NOTARY

**COMMONWEALTH OF PUERTO RICO**
**GENERAL COURT OF JUSTICE**
**COURT OF FIRST INSTANCE**
**SUPERIOR COURT, SAN JUAN PART**
**JUDICIAL CENTER OF SAN JUAN**

| | |
|---|---|
| VANESSA SACARELLO<br><br>PLAINTIFF<br><br>V.<br><br>AMERICAN AIRLINES, INC.<br><br>DEFENDANT | CIVIL NO.: _____<br><br>Summary Employment Claim Procedure |

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW the plaintiff, Vanessa Sacarello ("Sacarello"), represented by the undersigned legal counsel, and very respectfully STATES, ALLEGES AND PRAYS:

1. The plaintiff is Mrs. Vanessa Sacarello ("Sacarello"), whose residential and mailing address and telephone number are as follows: Cond. Monte Real, 100 Road 877, Apartment 106, San Juan, Puerto Rico 00926; telephone number, (787) 342-2820.

2. The defendant is American Airlines, Inc. ("AA"), a company in the airline industry that renders services in Puerto Rico, among other places, at the Luis Muñoz Marín International Airport in Carolina, Puerto Rico. Its Resident Agent is CT Corporation System, San Francisco Street, Number 361, Old San Juan, Puerto Rico 00901.

3. The summary employment claim procedure laid down in Act 2-1961, as amended, 32 L.P.R.A. 3113 et seq. ("Act 2") is hereby invoked. Act 2 provides that legal claims may be filed in the Court of First Instance of the Judicial district where the plaintiff resides or where the work was performed for the employer. In this case, the plaintiff resides in the judicial district of San Juan. Therefore, the Court of First Instance, Superior Court, San Juan Part has jurisdiction to hear this case.

**Note: * Exempt from cancelling stamps, as this is a case under the summary employment claim procedure, Act No. 2 of October 17, 1961, as amended, 32 L.P.R.A. 3118 et seq.; <u>Valentín v. Housing Promoters, Inc.</u>, 146 D.P.R. 712 (1998).**

4.  Sacarello worked for AA from March 1979 to September 30, 2020. She began working for AA at the age of 19 as Secretary of the Purchasing Agent. Subsequently, she held various positions, such as: Accounting, Budget, Customer Services Agent, Lead Agent, Customer Services Supervisor, Customer Services Manager. As a Customer Services Manager, she reported to Mr. José Rucabado, General Manager. She was the Customer Services Manager who had the most seniority at AA in Puerto Rico.

5.  The position of Customer Services Manager is very comprehensive. It includes tasks known as below-the-wing tasks, which refer to tasks performed in the area of the ramps, and tasks known as above-the-wing tasks, which refer to tasks performed at the terminals, such as the Ticket Center, the luggage area, interaction with Aerostar, Services Agreements (such as Antilles), and Transportation Security Administrator [sic] ("TSA") and exits of the airport.

6.  The responsibilities of the Customer Services Manager are to: (1) provide quality services and obtain the greatest possible customer satisfaction; (2) meet goals of profitability and control of expenses and costs; (3) ensure compliance with safety regulations, operational processes and applicable federal guidelines; (4) provide members of the team fair, reasonable and equitable treatment; (5) run an effective operation.

7.  Sacarello always had an excellent job performance in all the positions she held at AA, very particularly the position of Customer Services Manager, which she held for thirty (30) years.

8.  During the period included from April 6, 2020, to June 28, 2020, Sacarello was on administrative leave, during which she was paid 23% of her regular salary, at a rate of $9.41 per hour, that is, $1,505.54 monthly.

9.  At the end of May 2020, AA announced that it was going to implement a mass reduction of its workforce at the Luis Munoz Marín International Airport, which would involve 30% or more of its managerial employees. At the time, Mr. José Rucabado, AA Manager at the Luis Muñoz Marín Airport operation, and Mrs. Mildred Fuentes Viera, Airport Manager, held a telephone conference that was

SJ2020CV05909    11/02/2020    04:54:06 p.m.    Entry No. 1    Page 3 of 10

attended by the three (3) Customer Services Managers: Mrs. Sally Pérez, Mr. Felipe Otero and Mrs. Sacarello; two (2) employees in clerical positions, namely: Mrs. Ana Carrión (Assistant of General Manager Mr. José Rucabado) and Mrs. Irma Matos (who had finance duties); and a level 2 managerial employee, Mrs. Maryl Mendoza. The agenda of the aforementioned meeting was to address the topic of AA's workforce reduction at the Luis Munoz Marín International Airport.

10.    At the meeting, AA Management confirmed that the company had announced, and would proceed with, a general, thirty percent (30%) reduction of its staff, but that the projection was that the reduction would be even greater, depending on the city and the flights to be reduced. It was never informed that new personnel would be recruited, as part of this process to downsize AA's staff at the Luiz Muñoz Marín International Airport. Nor was it ever informed that at least one Customer Services Manager position would be retained (as it in fact was). Had this been informed, it was for Sacarello to have been retained in her position, pursuant to the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

11.    What was informed at the time was that the company would offer voluntary benefits packages, but no compensation whatsoever for termination or severance pay under the law, as the terminations were justified by legitimate downsizing. Furthermore, they informed that any employee who did not accept these benefits would not receive any additional payment or benefit whatsoever for the termination. We repeat, it was never informed that new personnel would be recruited after the resignations and terminations in question. Nor was it ever informed that at least one Customer Services Manager position would be retained (as it in fact was). Had this been informed, it was for Sacarello to have been retained in her position, in accordance with the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

12. Very specifically, on May 27, 2020, AA made an official announcement in writing, which, among other things, indicated: "Additionally, running a smaller airline means we will need a management and support staff team that is roughly 30% leaner."). This announcement clearly implies that additional personnel would not be recruited. Nor was it informed that at least one Customer Services Manager position would be retained (as it in fact was). Had this been informed, it was for Sacarello to have been retained in her position, in accordance with the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

13. Sacarello insisted on being informed of the actual number of jobs to be cut in Puerto Rico, but this was never specified to her. She was always told that the staff would be downsized, and that if she did not accept the benefits package, she would not obtain any other benefit, if she was terminated. Again, she was never told there would be new recruitments, much less of personnel to perform her duties and tasks. Nor was she informed that at least one Customer Services Manager position would be retained (as it in fact was). Had this been informed, it was for Sacarello to have been retained in her position, in accordance with the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

14. Sacarello decided to sign up for the voluntary benefits plan because she was convinced that based on what was implied by the announcements made by AA's Management, her position would be impacted by the staff reduction and there would be no other viable employment opportunities for her there. Essentially, the benefits package consisted in being on administrative leave from June 29, 2020, to September 30, 2020, collecting thirty-three percent (33%) of her salary, at a rate of $12.42 per hour, that is, $1,987.30 monthly. The payment for these three (3) months was of approximately $11,314.14. There certainly was no justification whatsoever for offering Sacarello a benefits package of $11,314.14, if her position was not going to be eliminated (especially when, as we will see hereinbelow, her severance pay under Act 80 was of $216,524.00). However, AA concealed from Sacarello the fact that her position would be maintained.

15. The highest annual salary earned by Sacarello during her last three (3) years at AA was $74,073.64 annually, (that is, $6,172.80, monthly, $1,424.50, weekly).

16. Sacarello's severance pay under the provisions of the Wrongful Termination Act, Act 80-1976, as amended, 29 L.P.R.A. 185, ("Act 80") amounts to a basic compensation of six (6) months of salary, namely: $37,037.00, and a progressive compensation equivalent to three (3) weeks' pay for every complete year of service, that is, 42 years, for the salary of 126 weeks x $1,424.50 per week = $179,487.00. The total severance pay is $216,524.00.

17. As stated earlier, the voluntary benefits package consisted of 33% of her salary from mid-June 2020 to September 30, 2020, that is, $11,314.44, and health insurance for 18 months after September 30, 2020.

18. The voluntary package was offered to mitigate the effects of a justified termination. However, if at least one Customer Services Manager position was going to be maintained, there was no need to approach Sacarello about leaving her job in exchange for modest consideration. The mere fact that the offer was made implied that she would be terminated.

19. Sacarello accepted the voluntary benefits package because she was convinced that she was going to be terminated, and she did not know that her position would be maintained.

20. The voluntary package did not require the execution of a Waiver and Release of Liability Agreement.

21. It was after she accepted the voluntary benefit package that she was then asked to sign a Release of Liability Agreement as a condition to pay her the benefits in question.

22. The Waiver and Release of Liability Agreement did not expressly include a release from payment of the severance pay provided for under Act 80.

23. In view of the representations made by AA's Management, it was reasonable to conclude that she was going to be terminated as part of the downsizing and, therefore, for good cause, and the offer (through financially unattractive, namely $11,314.44, when the severance pay that Sacarello was

entitled to under the law was of $216,524.00) thus constituted fair and equitable consideration. The only other option was to be terminated and not receive anything. Furthermore, she did not know there would be job opportunities. The only thing that was discussed was the downsizing of AA's staff at the Luis Muñoz Marín Airport, much less did Sacarello know (because it was concealed from her) that at least one Customer Services Manager position would be retained.

24. Prior to accepting the voluntary benefits package and signing the Liability Agreement, Sacarello was never told that her position would be maintained, or that new personnel would be recruited to assume her duties and tasks immediately after she was separated from employment with the company. The fact that at least one Customer Services Manager position was going to be maintained made it unnecessary to terminate Sacarello. In addition, if anyone was going to be recruited to perform her work and duties, this also made her termination wrongful (if the order of recruitment by seniority was not followed). In other words, Sacarello not only had the right to be retained in her job (because she was the employee with the most seniority in her position), but, in the event that she was terminated, under Act 80, she also had the right to be rehired if the same, or similar, services or work as the ones that she performed were necessary within six (6) months of her termination and employees were going to be recruited to perform such tasks and duties. As we have seen, her services continued to be necessary, inasmuch as a Customer Services Manager position was maintained and additional personnel were immediately recruited to perform her tasks and duties. Nor was it informed that at least one Customer Services Manager position was going to be retained (as it in fact was), because had this been informed, it was for Sacarello to have been retained in her position, in accordance with the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

25. As stated earlier, Sacarello was the employee with the most seniority in her position. Therefore, if at least one Customer Services Manager position was going to be maintained, and the same or similar services as the ones that she performed were necessary, she had the right to retain her job or to be

SJ2020CV05909    11/02/2020    04:54:06 p.m.    Entry No. 1    Page 7 of 10

reinstated. Had Sacarello been informed that a Customer Services Manager position would be maintained and that new personnel would be recruited, she would not have agreed to resign in exchange for the limited benefits offered. There was clearly and simply, a deliberate and fraudulent concealment to induce Sacarello to accept an arrangement for her to leave the company, which, had she accurately known all of the current circumstances that AA had knowledge of, she would never have agreed to. In fact, if AA's intent was to retain at least one Customer Services Manager position, and it needed the same or similar functions as the ones that Sacarello performed (inasmuch as new, additional personnel was hired), AA should not even have offered to Sacarello the benefits in question. Granting benefits due to the effects of the downsizing was not necessary if her position was not going to be affected by the downsizing. Everything that occurred demonstrates *a posteriori* that Sacarello was induced to leave her job by hiding from her necessary information that was available to AA and by making representations that did not reflect the totality of the circumstances present here. Nor was it informed that at least one Customer Services Manager position was going to be retained. Had this been informed, it was for Sacarello to have retained her position, in accordance with the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

26.    Then, Mr. José Rucabado, the General Manager, upon learning that at least one Customer Services Manager position would be maintained, after Sacarello had already signed the voluntary benefits package, intervened for the acceptance of the voluntary benefits packages to be suspended and Sacarello to be called back to work. Mr. Rucabado's claim was ignored. Mr. Rucabado was then terminated.

27.    It turns out that at least one Customer Services Manager position was maintained, and that the same, or similar, duties as the ones that Sacarello performed were not ultimately eliminated, and an additional, younger employee with less experience was recruited. Furthermore, if personnel with less

7

SJ2020CV05909    11/02/2020    04:54:06 p.m.    Entry No. 1    Page 8 of 10

seniority than Sacarello was going to be recruited for her position, she had to be given the opportunity, in accordance with the order of retention laid down in Act 80, instead of inducing her to accept the limited benefit package for the company's use. Therefore, if a Customer Services Manager position was going to be maintained (as it in fact was) and new, additional personnel was going to be recruited to perform Sacarello's tasks and duties, Sacarello's separation from employment is in fact wrongful. She accepted the voluntary benefits package, based on representations that reasonably implied that no Customer Services Manager position whatsoever was going to be maintained, and that there was no plan to recruit any new personnel. It was deliberately concealed from her that a Customer Services Manager position was going to be maintained, and it was also concealed from her that the company intended to recruit additional personnel to perform her duties. AA's actions were aimed at inducing Sacarello to leave her job, pursuant to false representations and the deliberate concealment of the truth. The only reasonable option that Sacarello had was to accept a modest voluntary benefit package in view of an imminent termination for which she would not receive any payment whatsoever.

28. We repeat, if AA had not concealed its true intentions and had disclosed in good faith the totality of the circumstances that it had knowledge of, Sacarello would not have agreed to leave her job in exchange for a modest benefits package.

29. We hereby ask that Sacarello be paid the severance pay that she is entitled to under Act 80, namely.

30. The release of liability signed by Sacarello with AA is not a valid settlement agreement under Article 1716 of the Civil Code of Puerto Rico, 31 L.P.R.A. 4828.

31. The consent given by Sacarello was defective, because she gave consent through error, intimidation and fraud. Articles 1217 of the Civil Code of Puerto Rico, 31 L.P.R.A. 3402.

32. The lack of valid consent on Sacarello's part makes what was agreed upon null.

33. Sacarello's consent is defective because she was deliberately deceived and led to believe that she would be terminated. She was not informed that the intention was to open her position and/or duties that were the same or similar to the ones that she performed, once she had signed the Agreement. The fact that new personnel would be recruited was concealed from her. The only thing that was mentioned to her was that the workforce would be downsized. She was led to believe that if she did not accept the benefits plan, she would be terminated and would not have any benefit or right whatsoever. She was informed that there was just cause for the terminations. She was not informed that at least one Customer Services Manager position would be retained. Had this been informed, it was for Sacarello to have been retained in her position, in accordance with the order of retention laid down in Act 80, and she would not have accepted the voluntary benefits package.

34. Under Act 4.10 of Act 4-2017, 29 L.P.R.A. 185i, in order to validly settle the right to severance pay under Act 80, all of the requirements for a valid settlement agreement must be present. There is not a valid settlement agreement in this case. The consent is defective and the cause is insufficient. This renders the agreement null and consequently unenforceable.

35. Furthermore, as we have seen, the Agreement does not include an express waiver of the severance pay laid down in Act 80.

WHEREFORE, we very respectfully pray that this Honorable Court grant this Complaint and consequently hold that Sacarello is entitled to the benefit of the severance pay laid down in Act 80; that she was in fact induced, through false representations and dolus, to leave her job, in exchange for a voluntary benefits package; that the Waiver and Release of Liability Agreement is null, due to lack of valid consent and sufficient cause; and grant attorney's fees, costs and expenses of interests.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 2nd of November 2020.

s/ Enrique J. Mendoza Sánchez
ENRIQUE J. MENDOZA SÁNCHEZ
RUA: 21143

s/ Enrique J. Mendoza Méndez
ENRIQUE J. MENDOZA MÉNDEZ
RUA: 8304

**MENDOZA LAW OFFICES**
P.O. Box 9282
San Juan, Puerto Rico 00908-0282
Tel.: (787) 722-5522; 5530; 5540
Fax: (787) 723-7057
mendozalo@yahoo.com

**Note: * Exempt from cancelling stamps, as this is a case under the summary employment claim procedure, Act No. 2 of October 17, 1961, as amended, 32 L.P.R.A. 3118 et seq.;** <u>*Valentín v. Housing Promoters Inc.*</u>**, 146 D.P.R. 712 (1998).**

---

CERTIFICATION OF TRANSLATION

I, Carol G. Terry, a US-Court-Certified-Interpreter, Certificate No. 03-001, and translator with an MA in Translation from the University of Puerto Rico, do hereby certify that, to the best of my knowledge and abilities, the foregoing TWELVE (12) PAGES are a true and correct translation of the original document in Spanish.

_____
Carol G. Terry

---