UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| VANESSA SACARELLO | **CIVIL NO.** 20-1661 (RAM) |
| **Plaintiff and Counter-Defendant** | (LEAD CASE) |
| V. | |
| AMERICAN AIRLINES, INC. | |
| **Defendant and Counterclaimant** | |
| SALLY PÉREZ-RODRÍGUEZ | **CIVIL NO.** 20-1684 (RAM) |
| **Plaintiff and Counter-Defendant** | (MEMBER CASE) |
| V. | |
| AMERICAN AIRLINES, INC. | |
| **Defendant and Counterclaimant** | |

<u>OPINION AND ORDER</u>

RAÚL M. ARIAS-MARXUACH, District Judge

Pending before the Court is defendant American Airline, Inc.'s ("Defendant" or "AA") *Motion for Summary Judgment* ("MSJ"). (Docket No. 55). For reasons set below, the Court **DENIES** the MSJ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 22, 2021, Plaintiffs and Counter-Defendants Vanessa Sacarello ("Sacarello") and Sally Pérez-Rodríguez ("Pérez-Rodríguez") (jointly, "Plaintiffs") filed separate *Amended*

*Complaints* against AA invoking the Court's diversity of citizenship jurisdiction. (Docket Nos. 38-39).[1] Plaintiffs were AA employees who agreed to participate in AA's "Voluntary Early Out Program for Management & Support Staff" ("VEOP"). Their Amended Complaints allege the General Release ("Release") they signed after agreeing to participate in VEOP, and thereby terminating their employment at AA, should be declared null and void due to a lack of valid consent and sufficient cause. Id. To wit, they argue AA induced them to leave their jobs through false representations and dolus and that, as a result, the Release barring them from suing AA is void. Id. Finally, they also aver they are owed severance pay under Puerto Rico's wrongful discharge law, P.R. Laws Ann. 29, § 185 *et seq.* ("Law 80") and they are entitled to pay and benefits under the Payroll Support Program Extension ("PSP"), a program under the Coronavirus Aid, Relief and Economic Security Act providing payroll support to passenger and cargo air carriers and certain contractors. Id.

On July 6, 2021, AA answered the *Amended Complaint*s. (Docket Nos. 40-41). It also filed Counterclaims stating that, in filing suits against AA and not returning the money they received under

---

[1] Pérez-Rodríguez initially filed a separate suit on December 20, 2020. *See* Case No. 20-cv-1684. That case was then consolidated with the present one pursuant to Fed. R. Civ. P. 42 and transferred to the undersigned's docket in January 2021. (Case No. 20-cv-1684, Docket No. 17; Case No. 20-cv-1661, Docket No. 18).

the VEOP, Plaintiffs were liable for breach of contract and unjust enrichment. (Docket Nos. 40 at 6-11; 41 at 6-11).

Defendant subsequently filed an MSJ averring that Plaintiffs are not entitled to severance pay under Law 80 because they consented to release AA from any wrongful discharge claims. (Docket No. 55 at 4-8). AA further maintains Plaintiffs did not prove they were constructively discharged because they voluntarily resigned from their jobs. Id. at 8-13. It also avers that Plaintiffs' claims under PSP should be dismissed because Law 80 is the sole remedy for discharge without cause and PSP does not create a private cause of action. Id. at 13-15. Finally, Defendant contends the Court should grant its Counterclaims. Id. at 15-17.

Plaintiffs responded to the MSJ (the "*Response*") reiterating their claim that the Release is null and void because AA's deceitful representations, such as not telling them that their roles at AA were not going to be impacted by the reduction, affected their consent to the Release. (Docket No. 65 at 4-15). Likewise, they posit their Law 80 claims are not waivable because the Release is invalid. Id. at 15-17. They also argue that Law 80 should be liberally construed in their favor and the totality of the circumstances test must be applied to determine if their resignations were voluntary. Id. at 17-22. AA replied to the *Response*, to which Plaintiffs filed a sur-reply. (Docket Nos. 68, 76).

## II. STANDARD GOVERNING RULE 56 SUMMARY JUDGMENT

Summary judgment is proper if the movant shows that: (1) there is no genuine dispute as to any material fact; and (2) they are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of" the nonmovant. Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material only if it can alter the outcome of the suit under governing law. *See* DLJ Mortg. Cap., Inc. v. Vazquez Perez, 2021 WL 3668241, at *2 (D.P.R. 2021) (quotation omitted). There is no issue of material fact if the movant demonstrate the nonmovant has not "made a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 131 (1st Cir. 2014) (quotation omitted). Thus, the nonmovant may defeat summary judgment by showing "through submissions of evidentiary quality, that a trialworthy issue persists." Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a nonmovant must admit, deny or qualify the facts supporting a summary judgment motion by referencing each paragraph of the movant's statement of material facts. Id. Adequately supported facts shall be deemed admitted unless

controverted per the manner set forth in the local rule. *See* <u>Vogel</u>
<u>v. Universal Insurance Company</u>, 2021 WL 1125015, at *2 (D.P.R.
2021) (quotation omitted). (quotation omitted). Litigants ignore
this Rule at their peril. <u>Id.</u>

### III. FINDINGS OF FACT[2]

To make findings of fact, the Court analyzed AA's statement
of uncontested material facts ("SUMF")*,* Plaintiffs' opposition
thereto, Plaintiffs' additional statement of facts ("PASF") and
AA's response to Plaintiffs' opposition and to the PASF. (Docket
Nos. 55-1, 65-1, 65-2 and 68-1). Defendant, in replying to
Plaintiffs' PASMF, stated that several emails relied upon by
Plaintiffs were inadmissible because they were not authenticated.
(Docket Nos. 65 at 4-12; 65-2; 65-3 at 5-16; 68-1 at 18-20). AA
also stated Plaintiffs needed to provide the entire email chain
per the rule of completeness (Fed. R. Evid. P. 106) to ensure the
statements therein are not taken out of context. (Docket No. 68-1
at 18-20).

The Court disagrees. First, Defendant produced the emails
during discovery. Second, AA's reply to Plaintiffs' *Response* **cites
the same emails it seeks to exclude**. Thus, Defendant essentially
authenticated them, and the Court can consider them on summary
judgment. The United States Supreme Court has clearly held that

---

[2] References to a Finding of Fact shall be cited as follows: (Fact ¶ __).

"[b]y producing the documents, respondent would relieve the [opposing party] of the need for authentication." United States v. Doe, 465 U.S. 605, 614 n. 13 (1984); *see also* In re Homestore.com, Inc. Sec. Litig., 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) (finding that "emails written by a party are admissions of a party opponent and admissible as non-hearsay under Fed.R.Evid. 801(d)(2)."). After only reviewing facts properly supported by the record, uncontroverted and material to the resolution of the MSJ, the Court sets out its findings of fact.

1.  Sacarello and Pérez-Rodríguez had been employed at AA since 1979 and 1989, respectively. (Docket No. 55-1 ¶¶ 2-3).

2.  The last position they held with AA was as "Customer Service Managers / Airport Customer Operations" ("CSM") at the Luis Muñoz Marín International Airport in San Juan, Puerto Rico (the "San Juan station"). Id. ¶¶ 4-5.

3.  In May 2020, that station had three CSMs: Sacarello, Pérez-Rodríguez, and Felipe Otero ("Otero"). Id. ¶ 7.

4.  The CSMs were part of AA's San Juan Management and Support Staff ("MSS") team. (Docket No. 55-4 at 15-16).

5.  During the relevant period, the General Manager of the San Juan station was José Rucabado ("Rucabado"). (Docket No. 55-1 ¶ 6).

6.  On May 27, 2020, AA issued a communication to all domestic MSS team members, including those in Puerto Rico, stating

that because of the COVID-19 pandemic, it would implement some cost-saving measures. Id. ¶¶ 13-14, 23.

7.   These measures included a 30% reduction of the MSS. Id.

8.   AA also provided several separation packages: (1) VEOP with Pay Priority; (2) VEOP with Travel and Health Priority; and (3) Involuntary Separation Package. Id. ¶ 22.

9.   The MSS were warned that if not enough employees signed up for the VEOP, and instead chose to see if their position would be impacted by the reduction, AA could involuntary separate them from their role. Id. ¶¶ 16-17.

10.  The deadline to apply for VEOP was June 10. Id. ¶ 25.

11.  If after applying, MSS team members wanted to choose another VEOP option or withdraw their application, they had until June 10 to do so. Id. ¶¶ 26-27.

12.  The MSS were told that they would be notified if they were selected for VEOP by June 18. Id. ¶¶ 29-30.

13.  AA also clarified that "[t]here could be scenarios where VEOP requests are not granted due to operational / business needs, but [AA's] goal is to grant as many as possible." (Docket No. 55-9 at 1).

14.  Sacarello and Pérez-Rodríguez applied to VEOP on June 10. (Docket No. 55-1 ¶ 40).

15. Sacarello selected the VEOP Travel and Health Priority and Pérez-Rodríguez opted for the VEOP with Pay Priority. <u>Id.</u> ¶¶ 41-42.

16. Otero elected to not participate in the VEOP. <u>Id.</u> ¶ 49.

17. On June 11, Mr. Juan Liscano ("Liscano"), the AA Vice-president of HUB Operation in Miami who oversaw the Caribbean region, emailed Rucabado regarding the San Juan station's flight schedule informing him that "**[his] plan at the moment [was] to keep 3 CSMs. [AA] will approve the two VEOPs but they will be replaced. This is not to be communicated yet as the final is not yet approved.**" (Docket No. 65-3 at 6) (emphasis added).

18. On June 12, Rucabado replied:

    Adding thoughts to this conversation.

    With the two CSM's Vanessa, and Sally leaving on VLEO, if we then decide to replace these CSM positions with other CSM's they will definitely claim foul because Vanessa and Sally they decided to [take] the VLEO based on the 30% plus reduction in MSS announce[d] by the company.

    Under PR Labor law 80, reduction of personnel by reasons of volume or reorganization is consider[ed] just cause, however it must be done by seniority. If any company decides not to do it by seniority, then a severance payment must be given to the employees. Because Vanessa is 41 years seniority and Sally is 33 years seniority the severance is a big lump sum.

> As a matter of fact, Sally before taking the
> VLEO expressed her desire to stay or be given
> a severance.
>
> **Filing these positions with CSM's at this time
> or in the near future could make us look that
> we intentionally left them go be replaced for
> junior candidates.**

Id. at 8 (emphasis added).

19. On June 15, María Teresa-López ("López"), the People Business Partner Manager Cargo and Customer Excellence at AA, emailed Liscano stating the following: "Reading this information again. Since [Plaintiffs] took this package voluntarily, we can always support that they were not forced. I think the risk is always there, but it will depend on the conversation that they had with Jose [Rucabado]." Id.

20. Liscano replied to López's email stating: "I agree. Can we check if Rucabado told them to take the package because their jobs were going to be made redundant." Id.

21. On June 16, Plaintiffs were notified via email that their applications for VEOP had been accepted. They were also informed that: (a) their last workday would be June 19; (b) they would be paid 33% of their base salary bi-weekly starting June 22 through the end of their chosen VEOP; (c) they would receive a Release via email on June 17; and (d)

to finalize their VEOP selection, they would need to review and sign the Release by June 19. (Docket No. 55-1 ¶ 45).

22. On June 18, López emailed several AA employees, including Plaintiffs, reminding them that they "must review and sign the general release of claims electronically … by 2 p.m. CT tomorrow, Friday, June 19." Otherwise, they risked being removed from their elected VEOP and considered for involuntary separation. Id. ¶ 46.

23. Plaintiffs signed the Release the morning of June 19. (Docket Nos. 55 ¶ 48; 68-4 at 4; 68-5 at 4).

24. In the afternoon of June 19, López emailed Liscano regarding Rucabado's conversation with Plaintiffs as to their positions at the SJU Station. Her email stated in part:

> Hi Juan Carlos,
>
> I had a conversation with Jose Rucabado, and while he didn't confirm that they will not have a position, he shared with them that there will be a 30% reduction. He asked them to think and decide what was the best outcome for them.
>
> Vanessa knew that she would not have been impacted, as she was the most senior CSM, she didn't want to stay being the only CSM in the station due to the workload.
>
> Vanessa contacted me asking about recall rights, and I have explained that there are no recall rights for management.

> **Jose R. believes that there is still liability when they learn that we are going to replace their positions.**
>
> . . .
>
> (Docket No. 65-3 at 8) (emphasis added).

25. Liscano replied asking if this meant they needed to "do something different with CSMs?" Id.

26. On September 2020, AA published a job posting for a CMS position at the San Juan station. (Docket No. 55-1 ¶ 71).

27. Neither Plaintiff applied for the position. Id. ¶ 72.

## IV. ANALYSIS

Under Puerto Rico contract law, deceit, or "dolo," may exist "either in the formation of a contract where a party obtains the consent of another through deceptive means, or in the performance of a contractual obligation where a party knowingly and intentionally, through deceitful means, avoids complying with its contractual obligations." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (internal quotation marks and citation omitted). Dolo is considered "grave" when it determines the consent of a party and "incidental" when it merely influences the party's consent. Id. Dolo "grave" nullifies the contract while incidental dolo only gives rise to a claim for damages. Id.

While dolo and fraud are similar concepts, they are not one and the same. As this District has explained, "a fact pattern involving contract fraud will always involve 'dolo,' but a fact

pattern involving 'dolo' will not always involve fraud."
Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler
Corp., 92 F. Supp. 2d 8, 19 (D.P.R. 2000). Accordingly, courts do
not apply the heightened pleading requirements of Federal Rule of
Civil Procedure 9(b) ("Rule 9(b)") to strictly dolo claims. Id.
Further, "dolo, like fraud, is not presumed, and the party alleging
dolo bears the burden of proof." Burk v. Paulen, 100 F. Supp. 3d
126, 135 (D.P.R. 2015) (citation omitted). Thus, a plaintiff must
sufficiently plead that the defendant "acted with intentional
fault or bad faith to deceive [them] when discussing the formation
of an agreement between the parties[.]" Id.

Here, although not stated explicitly, Plaintiffs allege dolo
grave in the Release's formation. They posit that: (1) they would
not have signed the Release had they known AA would retain at least
one CSM and hire new CSMs in their stead; and (2) AA purposefully
misled them into thinking their positions were at risk as part of
the 30% reduction announced in May 2020. (Docket Nos. 38 ¶¶ 11-
15, 25-29, 34; 39 ¶¶ 10-15, 24-28, 34). Notably, Plaintiffs did
not properly allege a fraud claim, relying mostly on a dolo theory
of liability. See id. Therefore, the Court need not subject the
Amended Complaints to heightened scrutiny pursuant to Rule 9(b).
See Generadora De Electricidad Del Caribe, Inc., 92 F. Supp. 2d at
19.

Plaintiffs have established genuine issues regarding AA's

alleged misrepresentation or omission of material facts at the time they applied for the VEOP and ultimately signed the Release. They argue AA knew the CSMs position at the San Juan station would not be affected by the reduction and that AA would replace their positions if Plaintiffs applied to the VEOP. Hence, they posit they were deceived into thinking they were going to be involuntarily separated if they did not accept one of the VEOP options. Plaintiffs thus saw no choice but to apply to the VEOP and sign and consent to the Release.

In support of their claims, Plaintiffs primarily point to an email exchange starting on June 11, 2020, a day *after* Plaintiffs applied to the VEOP, and ending after Plaintiffs signed the Release on June 19. (Facts ¶¶ 17-20; 24-25). These emails appear to show that AA knew that Plaintiffs' positions were going to be replaced and failed to tell them *before* they signed the Release. Further, Plaintiffs show that managers at AA were worried that Plaintiffs would "cry foul" once they found out they were going to be replaced.

For example, on June 11, Liscano emailed Rucabado about the San Juan station's flight schedule and informed him that "[his] plan at the moment [was] to keep 3 CSMs. **[AA] will approve the two VEOPs but they will be replaced. This is not to be communicated yet as the final is not yet approved.**" (Fact ¶ 17) (emphasis added). On June 12, Rucabado told Liscano that Plaintiffs would

"definitely claim foul because" they "decided to [take] the VLEO based on the 30% plus reduction in MSS announce[d] by the company." (Fact ¶ 18). Rucabado also referenced the fact that Pérez-Rodríguez had purportedly expressed a desire to stay at AA or be given severance and that filling Plaintiffs' CSM positions in the near future could make AA look as if it intentionally "left them go be replaced for junior candidates." Id. López replied on June 15, a day before Plaintiffs' VEOP applications were accepted by AA, that they could always say Plaintiffs applied to VEOP voluntarily, thus they were not forced to resign from AA. (Fact ¶ 19). López later supported this statement on June 19 by telling Liscano that:

> I had a conversation with Jose Rucabado, and while he didn't confirm that they will not have a position, he shared with them that there will be a 30% reduction. He asked them to think and decide what was the best outcome for them.
>
> Vanessa knew that she would not have been impacted, as she was the most senior CSM, she didn't want to stay being the only CSM in the station due to the workload.
>
> Vanessa contacted me asking about recall rights, and I have explained that there are no recall rights for management. (Fact ¶ 24).

Nevertheless, Defendant cannot offset the fact that it did not tell Sacarello her role would eventually be replaced by alleging she "knew" she would not be impacted by the reduction because of her seniority and that she "didn't want to stay being the only CSM in the station due to the workload." Id. The Supreme

Court has held that summary judgment is to be issued "sparingly" in litigation "where motive and intent play leading roles." Poller v. Columbia Broad. Sys., 369 U.S. 470, 473 (1962); *see also* Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) (finding that "determinations of motive and intent ... are questions better suited for the jury").

On another note, the Court also finds that the time Plaintiffs had to evaluate the Release before signing it could also have vitiated their consent. Plaintiffs were sent the Release on June 17 and were instructed that to finalize their VEOP election, they "*must* review and sign the general release of claims electronically … by 2 p.m. CT tomorrow, Friday, June 19," *i.e.*, barely two days after receiving the document. (Facts ¶¶ 21-23) (emphasis added). Otherwise, Plaintiffs risked being removed from their elected VEOP, and worse, be up for possible involuntary separation. (Fact ¶ 22). This raises a genuine issue of material fact as to whether Plaintiffs were given sufficient time to make a considered choice regarding whether to sign the Release and waive any claims against AA. *See e.g.*, Rosa Garcia v. Eaton Corporation, 2013 WL 1225780, at *18 (P.R. Cir. 2013) (finding that employee voluntarily waived any employment discrimination claims under local Law 100 or Law 80 against defendant corporation in part because she had forty-five days to decide whether to sign the release and to consult with counsel before signing the release and had seven days to revoke

the release if she so desired).[3] Hence, this too weighs in favor
of denying the pending MSJ.

## V. CONCLUSION

When viewed in the light most favorable to the nonmoving
Plaintiffs, an inference could be made that Defendant knew it was
going to replace Plaintiffs before even accepting their
applications for the VEOP and yet failed to inform Plaintiffs as
much. If this is the case, AA may have acted with dolo. Moreover,
the Court finds that there are genuine issues of material fact as
to whether Plaintiffs had sufficient time to evaluate the Release
before signing it. Therefore, the Court **DENIES** Defendant American
Airline, Inc.'s *Motion for Summary Judgment*. (Docket No. 55).
Because Plaintiffs' remaining claims and Defendant's Counterclaims
are contingent upon whether the Release at issue is valid or not,
and which the Court is not reaching at this juncture, these claims
also remain pending before this Court.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of August 2022.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge

---

[3] The Court notes that Puerto Rico Court of Appeals decisions "are non-binding,
but do provide instructive guidance." Teamcare Infusion Orlando, Inc. v. Humana
Health Plans of Puerto Rico, Inc., 2018 WL 9412924, at *5 (D.P.R. 24, 2018)
(citing West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940) and CPC Int'l,
Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77, 91 (1st Cir. 1992)).